**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| THE HARTFORD MUTUAL INSURANCE COMPANY, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Case No.: SAG-20-2713 |
| | * | |
| HOVERZON, LLC d/b/a Swagtron, *et al.,* | * | |
| | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OPINION**

Plaintiff The Hartford Mutual Insurance Company as subrogee of Carriage Hill Associates L.P. ("Plaintiff") filed an Amended Complaint against Defendants Imedia Brands, Inc., Swagway, LLC ("Swagway"), Hoverzon, LLC d/b/a Swagtron ("Hoverzon"), and PC Direct, Inc., seeking compensation for property damage sustained as a result of an allegedly defective hoverboard catching fire. ECF 44. Defendant Hoverzon has filed a motion to dismiss the Amended Complaint for lack of personal jurisdiction. ECF 52. Plaintiff opposed the motion, ECF 61, and Hoverzon filed a reply, ECF 62. This Court deferred ruling on the motion to dismiss pending jurisdictional discovery, which is now completed. ECF 66, 67. Following the conclusion of jurisdictional discovery, Plaintiff filed a supplemental response in opposition to the motion to dismiss, ECF 75, 77, and Hoverzon filed a supplemental reply. ECF 82. I have reviewed all of the relevant materials. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2018). For the reasons stated below, I shall deny Hoverzon's Motion to Dismiss.

BACKGROUND[1]

Swagway sells and ships hoverboard products throughout the United States, directly and through retail sellers including Evine Live, Inc. ("Evine").  ECF 44 ¶¶ 3, 15, 16, 18.  Swagway "did not disclose that defects in its product could cause self-ignition or that its hoverboards were otherwise unreasonably dangerous."  *Id.* ¶ 25.  On or about November 13, 2015, Gerell Perrington, a Maryland resident, purchased a Swagway X1 Hoverboard from Evine and gave it to his son, who lived in the Carriage Hill apartmensts in Suitland, Maryland.  *Id.* ¶¶ 29, 49, 50.  In late 2015 and early 2016, more information became public about hoverboard fires and explosions.  *Id.* ¶¶ 28, 35-40.  On February 17, 2016, UL LLC filed suit against Swagway for trademark infringement, alleging that Swagway had attempted to deceive the public into believing "that UL tested, inspected, and/or certified Swagway products."  *Id.* ¶ 51.  Swagway was, at this point, owned entirely and managed by Jianqing Zhu.  ECF 77-1 at 12.  During this period, Zhu also controlled two other relevant entities, 3BTech, Inc. d/b/a Zake USA and Zake IP Holdings, LLC.  *Id.* at 23, 74.  Also in February 2016, one of Zhu's 3BTech colleagues, Jerry Lin, formed Hoverzon, d/b/a Swagtron with Peggy Lin.  *Id.* at 6.  Zhu later acquired an ownership stake in Hoverzon, and as of September 18, 2020 is one of two members in the company alongside Peggy Lin.  *Id.*

While Hoverzon now operates under the Swagtron name, or at least sells some products under a licensed use of the Swagtron trademark, the Swagtron mark did not originate with Hoverzon.[2]  Initially, Zake IP transferred the Swagtron trademark to Swagway.  *Id.* at 7.  Swagway used the Swagtron.com domain name and sold its hoverboards through it, while 3BTech handled

---

[1] The facts are derived from the substantive evidence the parties submitted with respect to this motion, ECF 61-1, ECF 62-1, ECF 77-1, and from Plaintiff's Amended Complaint, ECF 44.  This summary is limited to facts relevant to the determination of jurisdiction over Hoverzon.

[2] While Hoverzon confirms that it sells some products under a licensed use of the Swagtron trademark, it does not seem to admit to "doing business as" Swagtron.  *See, e.g.*, ECF 34-2 ¶ 4.

operations of Swagtron.com, including sales and maintenance. *Id.* Swagway ultimately transferred the Swagtron trademark back to Zake IP in April, 2016. *Id.* Zake IP granted Hoverzon the Swagtron.com domain and trademark in December 2016. *Id.*

On or about July 6, 2016, Swagway initiated a recall of its Swagway X1 Hoverboards, acknowledging 42 reported incidents of its battery packs "smoking, catching fire and/or exploding." ECF 44 ¶¶ 62, 63. One option for customers participating in the recall was to request a $200 credit towards purchase of a Swagtron self-balancing scooter. ECF 61-1 at 7. Perrington did not receive notice of the recall. ECF 44 ¶ 66. On December 19, 2017, Perrington's hoverboard caught fire, causing severe damage to the Carriage Hill apartment complex's real and personal property, which was insured by Plaintiff. *Id.* ¶¶ 67, 69, 70.

## STANDARD

Hoverzon's Motion to Dismiss under Fed. R. Civ. P. 12(b)(2) challenges this Court's personal jurisdiction. Under Rule 12(b)(2), the burden is "on the plaintiff ultimately to prove the existence of a ground for jurisdiction by a preponderance of the evidence." *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989); *see Universal Leather, LLC v. Koro AR, S.A.*, 773 F.3d 553, 558 (4th Cir. 2014); *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003) (citing *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 59-60 (4th Cir. 1993)). When "a district court decides a pretrial personal jurisdiction motion without conducting an evidentiary hearing, the plaintiff need only make a prima facie showing of personal jurisdiction." *Carefirst of Md.*, 334 F.3d at 396 (citing *Combs*, 886 F.2d at 676). To determine whether the plaintiff has met this burden, "the court must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *Combs*, 886 F.2d at 676. The court need not "look solely to the plaintiff's proof in

drawing" all reasonable inferences in plaintiff's favor and may also look at the defendant's proffered proof and assertions regarding defendant's lack of contacts with the forum state. *Mylan Labs., Inc.*, 2 F.3d at 62.

To exercise personal jurisdiction over a non-resident defendant, a court must determine that (1) the exercise of jurisdiction is authorized under the state's long-arm statute, pursuant to Federal Rule of Civil Procedure 4(k)(1)(A); and (2) the exercise of jurisdiction conforms to the Fourteenth Amendment's due process requirements. *Carefirst of Md.*, 334 F.3d at 396. When interpreting the reach of Maryland's long-arm statute, a federal district court is bound by the interpretations of the Maryland Court of Appeals. *See Carbone v. Deutsche Bank Nat'l Tr. Co.*, Civil Action No. RDB-15-1963, 2016 WL 4158354, at *5 (D. Md. Aug. 5, 2016); *Snyder v. Hampton Indus., Inc.*, 521 F. Supp. 130, 135-36 (D. Md. 1981), *aff'd*, 758 F.2d 649 (4th Cir. 1985); *see also Mylan Labs.*, 2 F.3d at 61 (citing *Erie R.R. v. Tompkins*, 304 U.S. 64, 178 (1938)). Moreover, courts must address both prongs of the personal jurisdiction analysis, despite Maryland courts consistently holding that "the state's long-arm statute is coextensive with the limits of personal jurisdiction set out by the due process clause of the Constitution." *Bond v. Messerman*, 391 Md. 706, 721, 895 A.2d 990, 999 (2006); *see CSR, Ltd. v. Taylor*, 411 Md. 457, 472, 984 A.2d 492, 501 (2009) (noting that the personal jurisdiction analysis "entails dual considerations"); *Carefirst of Md.*, 334 F.3d at 396.

Under the first prong, the plaintiff must identify a provision in the Maryland long-arm statute that authorizes jurisdiction. *Ottenheimer Publishers, Inc. v. Playmore, Inc.*, 158 F. Supp. 2d 649, 652 (D. Md. 2001). Under the second prong, "due process requires only that . . . a defendant . . . have certain minimum contacts . . . such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326

U.S. 310, 316 (1945) (quoting *Milleken v. Meyer*, 311 U.S. 457, 463 (1940)).  This "minimum contacts" analysis depends on the number and relationship of a defendant's contacts to the forum state, and whether the present cause of action stems from the defendant's alleged acts or omissions in the forum state.  *Id.* at 316-19.

Finally, a court may exercise two types of personal jurisdiction, "general" or "specific." *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty.*, 137 S. Ct. 1773, 1780 (2017).  "General" jurisdiction is a fairly limited concept, since it only arises where "the continuous corporate operations within a state [are] so substantial and of such a nature as to justify suit against [defendant] on causes of action arising from dealings entirely distinct from those activities." *Int'l Shoe*, 326 U.S. at 318. "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011).  In the context of a corporation, the paradigm bases for general jurisdiction are "the place of incorporation and principal place of business." *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014).  The *Daimler* court clarified that while those paradigms are not necessarily the only bases for general jurisdiction, it would be "unacceptably grasping" to approve the exercise of general jurisdiction wherever a corporation, "engages in a substantial, continuous, and systematic course of business." *Id.* at 137-38 (declining to find general jurisdiction lies in every state in which a corporate defendant has "sizable" sales).

"Specific" jurisdiction arises when there is an "affiliation between the forum and the underlying controversy." *Goodyear*, 564 U.S. at 919; *Carefirst of Md.*, 334 F.3d at 397.  To assess specific jurisdiction, the Fourth Circuit considers: "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the

plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 278 (4th Cir. 2009) (quoting *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2002)).

## ANALYSIS

The Court outlined the essential features of this dispute in its previous decision, ECF 66, but restates them briefly here. Hoverzon argues that this Court does not have personal jurisdiction over it. ECF 52-1. Plaintiff acknowledges that this Court lacks general jurisdiction. ECF 61 at 8 ("Plaintiff does not contend that Hoverzon is at home in Maryland."). Instead, Plaintiff argues that this court can exercise specific jurisdiction based on provisions in Maryland's long arm statute covering business transactions and supplying goods in the state. ECF 61 at 9-10. The critical jurisdictional twist, however, is that the entity that sold Plaintiff the hoverboard is Swagway, while Plaintiff here sues an ostensibly separate entity, Hoverzon. Plaintiff contends that Hoverzon is a successor entity to Swagway and that it assumed a duty to warn Swagway's Maryland customers of the product defect. *Id.* at 8-9.

Plaintiff does not contend that Hoverzon, which was formed in 2016 after Perrington's hoverboard purchase, had any direct involvement in the sale of that item. Plaintiff's main contention is that Hoverzon "agreed to assume responsibility for providing notice of the X1 hoverboard's defective condition to Swagway, LLC's customers and handle the recall." ECF 44 ¶ 64. Hoverzon, meanwhile, asserts that it "did not 'handle,' control, direct, oversee, monitor, or supervise the recall of the Swagway X1 Hoverboard." ECF 62-1 ¶ 2. Similarly, while Plaintiff alleges that Hoverzon is the successor in interest to Swagway and is thus liable for its acts and omissions, ECF 44 ¶ 61, Hoverzon relies on public records establishing that "Swagway is a [sic] still a separate operating entity to this day," ECF 52-1 at 3, and on the declaration from its

authorized agent attesting, "Hoverzon was not formed until 2016 and never acquired, through purchase, transfer, or otherwise, Swagway's assets and did not merge with Swagway."  ECF 34-2 ⁋ 7.

Jurisdictional discovery has revealed information that suggests Hoverzon is a "mere continuation" of Swagway, such that the Maryland rule against successor liability does not apply.[3]  "[T]he underlying theory of the ["mere continuation" exception] is that, if a corporation goes through a mere change in form without a significant change in substance, it should not be allowed to escape liability."  *Baltimore Luggage Co. v. Holtzman*, 80 Md. App. 282, 297 (1989).  There are five factors Maryland courts use to assess whether a corporation is a "mere continuation" of a preceding corporation whose assets it acquired, namely: "(1) any change in ownership and management, (2) the continued existence of the selling corporation, (3) the adequacy of consideration, (4) the transfer of any 'instrumental' employees from the predecessor to the successor, and (5) the purpose of the asset sale."  *Martin v. TWP Enterprises Inc.*, 227 Md. App. 33, 60 (2016).  Particular, though not exclusive, importance is placed on the continuation of ownership or management across the selling and acquiring entities, as well as the purpose of the transaction.  *See id.*

As an initial matter, the Court must address two points Hoverzon makes regarding the transfer of assets between Swagway and Hoverzon that it asserts prevents the "mere continuation" doctrine from applying.  First, Hoverzon notes that it did not acquire any Swagway assets directly, but instead acquired Swagway's Swagtron trademark from Zake IP following Swagway's transfer

---

[3] Because the Court concludes, on the present record, that Hoverzon is a "mere continuation" of Swagway, it does not reach the close question of whether Hoverzon assumed responsibility for the hoverboard recall by virtue of its providing vouchers for its hoverboard as part of the recall and because the recall was publicized on Hoverzon's Swagtron.com website.

of the trademark to Zake IP.[4]   ECF 62 at 7.   For the existence of an intermediary transfer to undermine the "mere continuation" analysis would, however, run contrary to its underlying purpose, namely "prevent[ing] a situation whereby the specific purpose of acquiring assets is to place those assets out of reach of the predecessor's creditors."   *Baltimore Luggage*, 80 Md. App. at 297.   Indeed, while the limited Maryland case law covering "mere continuations" has not touched on the question of multiple asset transfers, there is case law in other jurisdictions where the final successors in chains of purchases of the assets of manufacturers of allegedly defective products were subject to liability under the mere continuation doctrine.   *See, e.g.*, *Nichols v. Roper-Whitney Co.*, 843 F. Supp. 799 (D.N.H. 1994); *see also* 13 A.L.R. 6th 355 at § 2 (explaining that, in cases involving chains of succession, some courts have found the ultimate successor may be subject to liability "where the factors favoring liability under the [mere continuation exception] persisted throughout the chain of succession").

Next, Hoverzon contends that only one asset is ever alleged to have been transferred from Swagway to Hoverzon—the Swagtron trademark—and suggests "[t]he transfer of a single asset between companies does not mean there is 'mere continuation or reincarnation' of those companies for personal jurisdiction reasons."   ECF 82 at 7.   Relatedly, it argues that the Swagtron trademark asset transfer has nothing to do with the underlying case regarding the Swagway X1 hoverboard

---

[4] Hoverzon suggests Zake IP merely licensed the Swagtron trademark to Swagway, such that the Swagtron trademark was not a "Swagway asset" that Hoverzon later acquired.   *See* ECF 82 at 3. The Trademark Assignment Agreement in which Swagway transferred the trademark to Zake IP, however, suggests that this was not a licensing relationship.   The Agreement identifies Swagway as "the owner of the entire right, title and interest in and to the [Swagtron] trademark," ECF 77-1 at 79, as opposed to a licensee.   It makes no mention of a termination of a previous licensing agreement—in fact, it fails to mention a license at all.   To suggest that this was a mere licensing agreement and that the Swagtron trademark was never a Swagway asset, despite contractual language designating Swagway as the "owner" of the trademark, appears on this record disingenuous.

and thus does not suffice for personal jurisdiction to attach to Hoverzon.  *Id.* at 7-8.  Both arguments misunderstand the nature of the "mere continuation" analysis and how it relates to personal jurisdiction.  The analysis does not center on the asset transfer itself but rather on the characteristics of the two entities between which the transfer occurred.  *See Nissen Corp. v. Miller*, 323 Md. 613, 620 (1991) ("The gravamen of the traditional 'mere continuation' exception is the continuation of the corporate entity. . . .").  Similarly, for personal jurisdiction to attach to Hoverzon as a "mere continuation" of Swagway, it is irrelevant whether the asset transfer itself implicated the underlying dispute over the allegedly defective Swagway X1 hoverboard.  If Hoverzon is determined to be a "mere continuation" of Swagway, it is *Swagway's* contacts with Maryland that provide the ultimate basis for jurisdiction.  *See City of Richmond, Va. v. Madison Mgmt. Grp., Inc.*, 918 F.2d 438, 455 (4th Cir. 1990) (holding that where evidence supports the imposition of successor liability, it is proper for the district court to assert personal jurisdiction). The Swagway asset(s) Hoverzon acquired need not be the hoverboards that are the subject of the dispute, but rather need only be asset(s) sufficient to make Hoverzon a "mere continuation" of Swagway such that Swagway's own unquestioned contacts via the marketing and sale of its Swagway X1 hoverboards in Maryland are imputed to Hoverzon.  *See In re Celotex Corp.*, 124 F.3d 619, 628 (4th Cir. 1997) (holding that jurisdiction may be based on the actions of a predecessor).

The first and most significant factor informing the Court's conclusion that Hoverzon is a "mere continuation" of Swagway is the overlapping membership of the two entities.  Both entities were, during the relevant periods, controlled at least in part by Jianqing Zhu.  At the time of Hoverzon's creation, Zhu owned 100% of Swagway and was its managing member.  ECF 77-1 at 12.  Directway, Inc. now owns Swagway, but Zhu remains the managing member.  *Id.*  Hovertron,

meanwhile, was founded by Peggy Lin and Jerry Lin, one of Zhu's colleagues at 3BTech/Zake USA. *Id.* at 6, 28. Zhu now controls Hoverzon alongside Peggy Lin. *Id.* Zhu also controls Zake IP Holdings, LLC, *id.* at 75, the entity through which the Swagtron trademark was transferred from Swagway to Hoverzon, as well as 3BTech, Inc. d/b/a Zake USA, *id.* at 17-24, the entity that purportedly ran Swagway's recall and handles Hoverzon's e-commerce business, *id.* at 7-8. Thus, every key player in this web of asset transfers is or has been controlled by Zhu.  It perhaps unsurprising, then, that corporate documents for Swagway, 3BTech/Zake USA, and Zake IP all list the same principal place of business that is listed on Hoverzon's Swagtron.com website: 3431 William Richardson Dr., South Bend, Indiana 46628.  ECF 77-1 at 19, 35, 74, 79.  These are not the hallmarks of an independent transfer of assets among separate and distinct entities, but rather are the sort of transfers that appear calculated to move assets from one entity embroiled in controversy to a new entity that will be free and clear of those difficulties, while owned by the same people.  The Court finds Zhu's common, controlling presence at Swagway and Hoverzon highly significant in determining whether the latter is a "mere continuation" of the former.

Common ownership or control alone is generally insufficient to establish "mere continuation" for the purposes of successor liability. *See Baltimore Luggage*, 80 Md.App. at 297. Here, while common ownership is the most significant factor in the Court's decision, it is not the only one.  The evidence presently before the Court suggests that, while Swagway continues to exist in name, it does not have any substantive operations.  As part of a series of consent and cease and desist orders, Swagway was forced to destroy its Swagway X1 hoverboard inventory and cease importing or selling Swagway products.  ECF 77-1 at 67.  In fact, Swagway's own interrogatory response suggests that, after the State of Indiana declined its request for a name change, it "did not have a foreseeable way to still conduct business that would not violate the proposal with Segway."

*Id.* at 14.  The timing of Hoverzon's founding and the subsequent transfer of the Swagtron trademark, meanwhile—coming amidst a series of legal setbacks and a voluntary product recall—suggests that the purpose of this transfer was to continue Swagway's functional operations under a different name and protect the Swagtron brand while insulating it from looming liability.  *See* ECF 77-1 at 6-14 (laying out the timeline surrounding Hoverzon's founding and the Swagtron asset transfers).[5]

While Plaintiff has provided sufficient evidence to establish that Hoverzon is a "mere continuation" of Swagway at this early juncture, the Court recognizes that there remain some significant questions regarding the relationship between Hoverzon and Swagway that may be further fleshed out as the case progresses.  For example, when, precisely, did Zhu take on his role as member of Hoverzon and when did he leave his leadership role in Swagway?  What sort of consideration did Zake IP give Swagway in exchange for the Swagtron trademark and, similarly, what consideration did Hoverzon subsequently provide Zake IP for it?  Is Swagway presently an assetless shell?[6]  Limited jurisdictional discovery did not unearth evidence answering such questions, but to the extent that the broader discovery process reveals additional information demonstrating that Hoverzon is not a continuation of Swagway, Hoverzon is free to re-raise its motion and object to the Court's exercise of specific personal jurisdiction going forward.  At this

---

[5] The remaining "mere continuation" factors provide little guidance one way or the other.  Jurisdictional discovery did not uncover any information about the adequacy of consideration or of the transfer of any "instrumental" employees from Swagway to Hoverzon.

[6] The parties disagree over the propriety of Plaintiff's interrogatory to Swagway regarding its ability to pay potential damages or settlement in this case.  The crux of this disagreement appears to be whether the interrogatory in question was part of the jurisdictional discovery and thus exceeded its scope, or whether it was an appropriate part of the general discovery process seeking information pertaining to an affirmative defense asserted in Swagway's Answer, ECF 53 at 15.  Resolution of this disagreement is not necessary to decide this Motion, but to the extent the disagreement persists as broader discovery ensues, the parties are free to re-raise the issue.

juncture, however, the present record contains sufficient evidence for the Court to exercise specific

personal jurisdiction over Hoverzon.  As such, its motion to dismiss will be denied.


Dated: April 13, 2021                                          _____/s/_____

                                                              Stephanie A. Gallagher
                                                              United States District Judge